# GRANDINETTE & SERIO, LLP

### ATTORNEYS AT LAW

114 OLD COUNTRY ROAD
SUITE 420
MINEOLA, NEW YORK 11501

ANTHONY M. GRANDINETTE
JOHN T. SERIO

TEL. (516) 248-5317
FAX (516) 294-5348
EMAIL: Jurytrial@aol.com

April 20, 2009

Honorable William D. Wall
U.S. District Court
Eastern District of New York
100 Federal Plaza
Central Islip, N.Y. 11722-4438

Re:     Eriksen v. Suffolk County, et.al. CV-06-2036

Dear Magistrate Wall:

The Plaintiff, by this letter motion, seeks an order from this Court allowing for the disclosure of certain Grand Jury minutes which pertain to the underlying criminal investigation into the facts and circumstances giving rise to the civil complaint pending before this court. Pursuant to a motion to unseal, filed in the Supreme Court for Suffolk County(EXHIBIT A), the Honorable Gary Weber ordered the production of the Grand Jury minutes to this Court for an in camera inspection to determine what, if any minutes are to be released to the plaintiff's counsel(EXHIBIT B).

### BACKGROUND

While in the custody of the Suffolk County Sheriffs' Department, Scott Eriksen was the victim of a physical assault initiated by defendant Deputy Sheriff (DS) Simovich resulting in a severe head injury which lead to his death. In response thereto, an internal investigation was conducted by the Suffolk County Sheriff's Dept., and further, the District Attorney for Suffolk County thereafter made a direct presentment to a Suffolk Grand Jury. The Grand Jury found No True Bill.

The disputed issues that arise in this case, are; First, how the injury occurred—intentional vs. unintentional; Second, post injury, were defendants' negligent in providing, or failing to provide, Eriksen with medical care[1];Third, did the defendants' conspire and lie about the events before and after Eriksen's injury.

In sum, the Suffolk employees involved in this case have stated in written form, sworn and unsworn testimony, that Scott Eriksen attempted to punch DS Simovich thereby initiating the physical confrontation and only in the subsequent struggle to

---

[1] The New York State Department of Corrections final report concluded that Suffolk County Sherriffs' Department failed to provide the minimum standard of care required by statute. (EXHIBIT C)

subdue Mr. Eriksen did he lose his balance, fall and strike his head.  Further, once the injury occurred, the defendant's acted reasonably  in their care of Eriksen.

The plaintiff claims that the injuries suffered by Mr. Eriksen were caused by DS Simovich, whose unprovoked assault caused Mr. Eriksen to fall and strike his head (EXHIBIT D 50h transcript of **eyewitness** Gary Eriksen @pp 55 - 57).

During the prosecution of this Civil Action, Deputy Simovich and Sergeant Noss provided deposition testimony.  In sum and substance, Simovich testified that it was the decedent, Scott Eriksen, whom first attempted to strike Simovich with a **"closed fist"** (emphasis added) and only in response thereto did Simovich engage the decedent in physical confrontation.  Noss testified although he did not see the attempted blow Simovich told him of it.  Each of their depositions were conducted in May 2007 (EXHIBIT E Simovich deposition @ 69-90 and EXHIBIT F Noss deposition @ 93-100).  Moreover, state Corrections Law compels an investigation into the cause(s) of an inmates  death occurring while in the custody of a correctional facility.  Pursuant to that investigation, an administrative hearing was held during which both Sgt. Noss and DS Simovich again testified.  This hearing was conducted nearly a year and half from the date of incident.  Again, their testimony alleges that it was Mr. Eriksen who initiated the aggression with DS Simovich responding (EXHIBIT G).   The Court is respectfully reminded that one of the plaintiff's claims centers upon the allegation that the named defendants conspired together and, in furtherance of that conspiracy, lied and misrepresented the true facts of what transpired leading to Eriksen's death in order to shield themselves from both civil and criminal liability.  On the very night this tragic incident took place, Sgt. Noss made several intra-departmental phone calls, concerning the incident.  The transcripts of those calls illustrate the lies contained in the "official" version of events referred to in the complaint. One need look no further than Sgt. Noss' telephone conversation with his supervisor, Captain Hewitt, when he was explaining what transpired:

| Jeff Noss: | **Typical mouthy 20-year-old, but he just, like I said, Eddie didn't nothing crazy, he didn't punch him, he didn't hit him, he just grabbed him and said shut  your friggin mouth and he just threw him in the cell, you know, "get in there", and he lost it and bam! But like I said he hit really hard, I mean like my spine shook, you know it was like still when you heard the noise?** |
|---|---|
| Captain Hewitt: | Yeah |
| Jeff: | **Like a coconut cracking?  Holy!** |
| Captain Hewitt: | Yeah, you took the words out of my mouth, like a coconut. |
| Jeff: | **I actually turned around and expected to see the blood coming out of his head right away.  He hit so hard. I mean it like stunned me when I turned around and heard the noise, I was like what?** |
| Captain Hewitt: | This may. |
| Jeff: | **You know this one is gonna bite us in the ass. (Laughing)** |

The distinction between the above dialogue and the official version is significant.

There is absolutely no indication that Eriksen was the aggressor. In fact, on the night at issue, Eriksen's conduct is described as nothing worse than that of a "typical mouthy 20 year old." At no point is it remotely suggested that Eriksen initiated this conflict (EXHIBIT G tab #1). That which has been set forth above clearly establishes the need for this Court to release the Grand Jury minutes. The inherent contradiction between the description of events provided to the State Corrections department and that which is contained upon the recordings referenced above, establishes at the very least, during one of those descriptions, the defendants were lying. Further, based upon the information uncovered during the discovery process herein, there is every reason to believe that the content of the Grand Jury testimony would be consistent to that given to the State Corrections Dept., at least to the extent where such testimony describes the manner in which the injury occurred and the subsequent quality of the medical care provided.

In **Ruther v. Boyle,** 879 F.Supp. 247, the Honorable J. Spatt of the United States District Court for the Eastern District of New York, citing the Supreme Courts decision in **Douglas Oil Co. Of California v. Petrol**, 441 U.S. 211, set forth the standard for the production of Grand Jury minutes.   In **Douglas**, the Supreme Court summarized the "particularized need" standard for disclosure of Grand Jury transcripts. In order to meet the particularized need standard, the party seeking grand jury material must show that:

1.  The material they seek is needed to avoid a possible injustice in another judicial proceeding:
2.  The need for disclosure is greater than the need for continued secrecy: and
3.  The request is structured to cover only material so needed.

The Court continued:

> *"The typical showing of particularized need arises when a litigant seeks to use the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like. Such use is necessary to avoid misleading the trier of facts."*

Unquestionably, the facts set forth above establish that the standards enunciated by the Supreme Court and further relied upon by Judge Spatt, concerning the release of grand jury minutes has clearly been met.

The second issue in dispute is whether the defendants provided an adequate level of medical care after the injury was inflicted. It is plaintiff's contention that once again, several defendants have been deceptive in their description of the injury and the care they provided. The support of this contention once again comes directly from the mouth of Sgt. Noss. The following is the relevant portion of Sgt. Noss testimony before the Corrections Board. Sargent Noss is discussing Eriksen's medical condition at the time when the ambulance personnel were present in the holding cell:

| | |
|---|---|
| Sergeant Noss: | ...**They (ambulance personnel) were leaning towards they thought it might be a drug overdose**, whatever. At that point, I was like let's just get him checked, I don't know, let's find out what's going on. So, they took their time padding him. He gave them a little bit of a hard time, didn't want to cooperate. |

| Peggy LoFredo: | Not purposely though? If he wasn't coherent, it must have been involuntary. |
| Sergeant Noss: | Yes, he was wrestling with them and pushing them off a little bit, but they got him packaged. |
| Peggy LoFredo: | And involuntary, you think? |
| Sergeant Noss: | Yes. |
| Peggy LoFredo: | Would you call it seizure activity? |
| Sergeant Noss: | **No, I wouldn't at that point, like I said because of the other actions, honestly, in my heart, I wasn't sure if it was real or not. We didn't know if he was really incoherent or the brother and him talked and now he was being incoherent. I just wasn't sure, as it didn't add up as we got a major injury, but they took him out any way at that point(EXHIBIT G tab #2).** |

Compare the foregoing to the words uttered by Sgt. Noss while making his second call seeking the whereabouts of the ambulance on the night at issue:

> **Quote** .... "where is the ambulance? **I think he's checking out**."
> (EXHIBIT G tab #3).

As I am certain Your Honor is aware, the term "checking out" is a common description of an individual who's in the process of dying! These words were spoken by Sgt. Noss after the incident took place, but PRIOR TO THE AMBULANCE CREWS ARRIVAL, without time for reflection or fabrication. Thus, despite telling the dispatch operator he believed Scott was dying before the ambulance ever arrived, Noss told state investigators that when the ambulance crew was attending to Scott he "honestly" wasn't sure if Eriksen was faking it!

The dispatcher was not confused by what Noss told him, however, as evidenced by his conversation to the 911 operator:

| 911: | Fire Rescue |
| Linda: | We requested an ambulance for the Cohalan Court Complex. Do you know if that ambulance is on the way. **The patient seems to be getting critical.** (EXHIBIT G tab #4). |

The description given by Sgt. Noss to the Corrections Board, a year and a half later, is so contradictory to the description given by him on the night at issue, that it can be characterized as nothing short of intentional deception. On the night this incident took place, all involved knew exactly how serious Scott Eriksen's injury was. To state otherwise is nothing short of a lie.

The plaintiff believes that while testifying before the grand jury, the defendants systematically lied concerning how the injury occurred, and thereafter, as was done at the state's corrections' inquiry, downplayed the severity of Scott Eriksen's condition. This testimony is critical to the prosecution of this action as their perjury constitutes the res gestie of one of plaintiff's claims. In addition, as referenced by some

brief examples above, the plaintiff will require this sworn testimony for impeachment purposes. Important to plaintiff's case is the fact that the grand jury testimony of the defendants is sworn and the corrections testimony is unsworn.

In addition to the Supreme Courts holding in Douglas, there is a plethora of New York law that also requires the release of the grand jury minutes in the case at bar.   There is no dispute that the grand jury testimony of those witnesses who testify at trial can and should be disclosed prior to their trial testimony to allow plaintiffs to impeach their testimony, refresh their recollections and/or lead a hostile witness. *See, e.g., **People v. Di Napoli**,* 27 N.Y.2d 229, 237 (1970); ***Martinez v. CPC Intern. Inc.***, 88 A.S.2d 656, 656 (2d Dept. 1982); ***Nelson v Mollen***, 175 A.D.2d 518, 520 (3d Dept. 1991).  It should be similarly done for any remaining witnesses who testify at the civil rights trial.   Further, New York C.P.L. § 190.25(4)(a) provides that, although grand jury transcripts are generally to be kept secret, they may be released upon written order of the court.  "Firmly settled is the rule that determination of the question whether disclosure should be permitted is addressed to, and rests in, the trial judge's discretion." ***People v. Di Napoli***, 27 N.Y.2d 229, 234 (1970).   Movants must first demonstrate a compelling and particularized need for access to the grand jury minutes. ***Matter of District Attorney of Suffolk County***, 58 N.Y.2d 436, 444 (1983).  Then, "[i]n exercising [its] discretion, the court must balance the perjuring interests involved, the public interest in disclosure against that in secrecy." ***People v. Di Napoli***, 27 N.Y.2d 229, 234 (1970).

In compliance with the requirements set forth in **Douglas**, the particularized need for access to the grand jury minutes is obvious.  Clearly, the grand jury transcripts are not only relevant, but critical to plaintiffs' theory of liability against defendants. *See* Fed. R. Evid. 401. The movants cannot obtain comparable evidence elsewhere.  As the question to be answered is "what occurred before the grand jury," not even the subsequent testimony of the defendants, would provide an adequate substitute for the actual evidence presented to the grand jury. *See People v. Cipolla*, 184 Misc. 2d 880, 882 (County Court, Rensselaer County 2000) ("The only way to obtain information related to allegations of corruption of the grand jury process is to delve into the grand jury record. The grand jury record is at the center, not the periphery, of the federal lawsuit [charging such corruption]."[2] In addition to movants' compelling need for the grand jury minutes, the public interest in this case also compels disclosure. The strong public interest in exposing and holding accountable extensive public corruption far outweighs any need for continued secrecy of the Grand Jury proceedings concerning the death of twenty-year old Scott Eriksen.

Respectfully submitted

Anthony M. Grandinette

---

[2]  *See also People v. Di Napoli*, 27 N.Y.2d 229, 238 (1970) ("The circumstance that the Commission might itself be able to gather the essential data and facts contained in the grand jury minutes is beside the point. This was a matter to be weighed by the courts below in deciding how to exercise their discretion. They were not required, as a matter of law, to compel the Commission to conduct its own investigation at the expenditure of considerable time and money and make a record of its own rather than avail itself of the existing record resulting from the grand jury inquiry.").